*Cat 4   15BE  ARR   No Fee No IFP*

✓ UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

DAVID NEKULA
    Plaintiff Pro Se

v.                         Case no. **10-1180**

MICHAEL J. BANOVSKY
    Defendant in his
    individual capacity;

MAURICIO JIMENEZ (a.k.a. JIMINEZ)
    Defendant in his
    individual capacity;

GREGG DREWS                     JURY TRIAL DEMANDED
    Defendant in his
    individual capacity;

ANTHONY J. BARRAVECHIO
    Defendant in his
    individual capacity;                 **RECEIVED**

JOHN DOE Inc.
    Defendant.                      SEP 7 2010

                                      CLERK, U.S. DISTRICT COURT
              VERIFIED COMPLAINT       WEST. DIST. OF PENNSYLVANIA

    Plaintiff brings the following actions:

(i) Federal action against Defendant BANOVSKY, hereinafter "Banovsky", for violations of Plaintiff's civils rights under 42 U.S.C. § 1983, and State claims of malicious and sadistic assault for the purpose of causing injury, and intentional infliction of emotional stress;

(ii) Bivens action against Defendant DREWS, hereinafter "Drews", for intentional infliction of emotional stress and negligence;

(iii) Bivens action against Defendant JIMENEZ, hereinafter

1.

"Jimenez", for intentional infliction of emotional stress and negligence.

(iv) State action against Defendant BARRAVECCHIO, hereinafter "Barravecchio", for intentional infliction of emotional stress;

(v) JOHN DOE, a federal corporation pursuant 28 U.S.C. § 1346(b) under theory of respondeat superior for negligence and failure to supervise actions of employees pursuant 28 U.S.C. § 2671 et seq.

(vi) A 42 U.S.C. § 1983 claim of conspiracy against all defendants, excluding JOHN DOE.

## VENUE

All the pertinent events the subject of this Complaint occurred in Pittsburg, Pennsylvania, in the judicial district of this court.

## PARTIES

a) Plaintiff is a resident of Tuscon, Arizona, currently incarcerated at FCI Safford, Arizona, serving a one-year one-day sentence.

b) Banovski was a Pennsylvania State Trooper detached to the Drug Enforcement Administration, hereinafter "DEA", Pittsburgh District Office at the time of the incidents complained about.

c) Jimenez was a co-case agent for the DEA Pittsburgh District Office at the time of the incidents complained about.

d) Drews was the group supervisor for the DEA at the time of the incidents complained about.

e) Tony was an officer of the Charleroi Police Department

detached to the DEA Pittsburgh District Office at the time of the incidents complained about.

f) JOHN DOE is a federal corporation having supervisory responsibility for the actions of all defendants in its employ at the time of the incidents complained about pursuant 28 U.S.C. § 2680(h). Based on information and belief, the DEA agents and the all other defendants were all either officers or employees of the DEA, or acting on behalf of DEA in official capacities temporarily in service of DEA, working under the direction of Group Supervisors Drews and co-case agent Jimenez.

## STATUTE OF LIMITATIONS

WHEREAS the statute of limitations for personal injury under Pennsylvania law is two years and Plaintiff's injuries commenced on September 24, 2008, Plaintiff is bringing suit against individuals in their individual capacities timely.

Plaintiff has filed a Federal Tort Claim Form 95 with JOHN DOE in mid-July 2010, which will make it liable to suit six months after the date of such filing in the event of denial, which is after the Pennsylvania statute of limitations expires.

Plaintiff will seek leave to amend to name and join JOHN DOE at the appropriate time to combine all parties in one litigation.

## JURISDICTION

This court has jurisdiction pursuant 28 U.S.C. §§ 1331, 1332, 1343 and 1346.

## FACTUAL AVERMENTS

1. On or about September 20, 2008, Plaintiff was instructed to fly to Pittsburgh, Pennsylvania, to assist the DEA in a controlled buy/bust of a target.

2. On September 24, 2008, Plaintiff was with the DEA agents and officers from several other law enforcement agencies all working for or on behalf of the DEA while they were preparing for the bust.

3. Drews was Group Supervisor.

4. Plaintiff was with the group for almost two hours as they were suiting up and getting ready.

5. Banovsky was also present donning his bullet-proof vest that was marked "B+".

6. Some were joking what it stood for and Plaintiff joked that it must be, "Bitch plus".

7. Other officers laughed, but Banovsky scowled.

8. Banovsky's reaction caused Plaintiff to joke that not only was he going to get shot, he would probably be beaten up during "arrest".

9. When they were ready, Jimenez instructed them all to go up to Plaintiff where he was sitting in one of the vehicles and identify him and see what he was wearing, which they did.

10. Jimenez informed Plaintiff that he would be filming the bust.

11. Barravecchio coached Plaintiff to get down on the ground when instructed as he was going to get arrested too as a ruse.

12. In a remote area of a Home Depot parking lot, visible from afar, target and a companion drove up to the vehicle of Barravecchio and Plaintiff.

13. After target and Barravecchio spoke, target returned to his vehicle and Barravecchio gave the signal.

14. Banovsky and another were in the lead.

15. They rushed past the targets straight for Barravecchio and Plaintiff without guns drawn.

16. Barravecchio shoved Plaintiff back behind him protectively and dropped down like he was doing push-ups.

17. Plaintiff was busy going down, on all fours, when he was rush tackled by Banovsky.

18. Banovsky slammed him to the ground, pinning his left arm underneath him.

19. Banovsky straddled Plaintiff shouting "Quit resisting" repeatedly while slamming Plaintiff's head on the ground.

20. Plaintiff was not resisting and had no reason to.

21. After handcuffing Plaintiff, Banovski retrieved the transmitter from Plaintiff's pocket for the target to see and stuffed it into another.

22. Plaintiff's glasses were smashed and bent.

23. Plaintiff shook them off his face and asked Banovski not to step on them.

24. Banovski placed the glasses in Plaintiff's pocket.

25. Plaintiff's mouth, face and elbow were bleeding and his skull and neck hurt badly.

26. After the target was gone, Plaintiff got into a shouting argument with Banovsky.

27. The whole argument and events should be on the recording of the transmitter.

28. Plaintiff asked Banovsky what his problem was.

29. Banovsky shouted that he was not sorry and he was not going to apologize.

30. Drews apologized to Plaintiff several times for him getting hurt, saying it was their mistake.

31. When they realized that the transmitter in Plaintiff's pocket was still on, they panicked, retrieved it quickly and turned it off.

32. Jimenez's video should have captured the entire episode.

33. The recordings of the transmitter should contain the audio of all that transpired.

34. A friendly State Trooper in whose car Plaintiff had to sit, asked if he needed an ambulance.

35. Plaintiff declined as he did not consider it critical and did not at that time know the full extent of his injuries.

36. Barravecchio and another officer took Plaintiff back to the motel. The other officer was Drews.

37. Later Plaintiff developed blurred vision and nausea, his head had started to swell and the pain in his neck became excruciating.

37. Plaintiff was not allowed to leave the motel or go anywhere by himself.

38. Plaintiff called S.A. Jimenez first thing in the morning and told him that he needed to get the an Emergency Room urgently.

39. S.A. Jimenez told Plaintiff that they were busy and would send someone later. Barravecchio arrived several hours later.

40. Barravecchio showed up later with another officer and drove

6.

Plaintiff to the hospital.

41. Barravecchio belligerently tried to discourage Plaintiff from going to the Emergency Room.

42. Barravecchio told Plaintiff that they would do nothing for him at the ER, for him to take Advil or Tylenol, which he kept offering.

43. Barravecchio told Plaintiff that if he insisted going to the hospital, it was going to make matters worse for him in his pending federal case.

44. Plaintiff's initial hospital costs were paid for by the DEA under Workmen's Compensation.

45. The DEA reimbursed Plaintiff for his broken glasses.

46. When Plaintiff told the agent that accompanied Barravecchio what Banovsky had done, he remarked it sounded like something Banovsky would do.

47. Drews had promised that the DEA would pay all Plaintiff's medical bills, they did not do so.

48. Plaintiff was unable to pay the outstanding bills, which damaged his credit rating.

49. Plaintiff informed the judge in his federal case what had transpired and the injuries he sustained.

50. The judge ordered an independant medical examination.

51. An investigation was done into the assault.

52. At time of his sentencing, a General Investigation Report IAD Control Number 2008 0683, Subject: Trooper Michael J. Banovsky was produced, an investigation conducted by the Bureau of Integrity and Professional Standards, Internal Affairs Division.

53. The Report was fraught with lies.

54. Banovski lied that it was a case of mistaken identity, that Plaintiff had not been at the briefing.

55. Banovsky lied that he ordered Plaintiff to the ground.

56. Banovsky lied that he struggled with Plaintiff as Plaintiff was not complying with his orders and was resisting.

57. Banovsky lied that he continued to tell Plaintiff to stop resisting and place his hands behind his back.

58. As Banovsky was sitting on Plaintiff, whose left arm was pinned underneath him, Plaintiff had no ability to get his arms behind his back either.

59. Banovsky lied that it was Plaintiff who was lying on his stomach with his arms underneath him so as not to make them available to be cuffed.

60. Banovsky lied that Plaintiff resisted.

61. Plaintiff had no reason to resist and did not resist.

62. Banovsky lied that he patted Plaintiff down for weapons.

63. Banovsky did not pat Plaintiff down.

64. Banovsky lied that he covertly replaced the transmitter in Plaintiff's pocket and quietly told him he had received information that he, Plaintiff was the target, that he would explain later.

65. Banovsky reached right for Plaintiff's pocket, removed the transmitter so the target could see it, and replaced it.

66. The entire time Plaintiff had been standing next to Barravecchio, the undercover, clearly visible from afar.

67. Banovsky lied that Plaintiff was transported from the scene

with the target to continue the ruse.

68. Plaintiff remained behind in the State Trooper's vehicle for another appproximately 15 minutes, bleeding and spitting blood and dirt before he was released.

69. Banovsky lied that he explained to Plaintiff that he, Banovsky had received radio traffic that indicated the target was standing out with the undercover, and that he was not going to let his undercover get hurt.

70. Evidently, none of the recordings of the alleged radio transmissions were produced for Corporal Lawrence doing the investigation.

71. Banovsky had seen Barravecchio shove Plaintiff in behind him protectively and could not have mistaken Plaintiff as being a threat to Barravecchio who is probably twice Plaintiff's size.

72. Banovsky lied that Plaintiff was upset because he was taken to the ground and his glasses were broken.

73. Plaintiff was already on all fours and he was upset at Banovsky's violence.

74. Banovsky lied that he had had his gun drawn and took Plaintiff to the ground with one hand and then holstered his gun.

75. Banovsky never had his gun drawn and Plaintiff was already on the ground.

75. Banovsky lied that he requested Plaintiff place his hands behind his back.

76. All Banovsky kept shouting was "Quit resisting!" every time he slammed Plaintiff's head onto the ground.

77. Evidently the video Jimenez took was also not shown to Corporal Lawrence doing the investigation.

78. Banovsky lied that he had not seen Plaintiff before the bust and did not know what he was wearing.

79. Banovsky lied that Plaintiff had Mexico to U.S. ties and was a cartel level dealer.

80. Plaintiff has no such ties or dealings, nor has he ever been accused of such.

81. Banovsky said that he had been told that the informant, Plaintiff, was arrested for bringing plane loads of marijuana from Mexico to Arizona.

82. Banovsky lied to protect himself.

83. Barravecchio lied to protect one of their own.

84. Barravecchio lied that a photograph of Plaintiff did not look like Plaintiff and Banovsky could have not know the individual he was arresting was Plaintiff.

85. Jimenez said the photograph did look like Plaintiff.

86. Drews said the photograph did look like Plaintiff.

87. Barravecchio lied that "the two struggled".

88. Barracchio lied that Plaintiff was not listening.

89. Barravecchio lied that Plaintiff wouldn't go down and did not listen.

90. Barravecchio lied that he witnessed Plaintiff struggle with Banovsky.

91. Barravecchio lied that he had reminded Plaintiff that he would be taken into custody and to obey the commands given him by the

10.

arresting officer.

92. Plaintiff knew he would be arrested as a ruse and did as he was instructed at the operation planning.

93. Barravecchio lied that Plaintiff did not have an explanation for his action.

94. Barravecchio is lying thus because they can't explain why Plaintiff who was not the target and knew he would be arrested as a ruse would have resisted arrest to justify Banovsky's violent assault.

95. Barravecchio lied that he saw no injuries to Plaintiff.

96. Barravecchio was the one to help brush Plaintiff off when he was obviously bleeding, welts and abrasions to his cheek and lip, and bleeding left elbow.

97. Barravecchio was present when others gave Plaintiff tissue and paper towels for his bleeding elbow and advised him to put an ice pack on it when he got back to his motel.

98. Barravecchio lied that Plaintiff's glasses were bent from someone accidently stepping on them.

98. Barravecchio watched the assault, watched the bent and smashed glasses still on Plaintiff's face, watched handcuffed Plaintiff shake them off asking Banovsky not to step on them, but to put them in his pocket.

99. Barravecchio lied that Plaintiff had described neck pain to him prior to the bust but that the information was never relayed to the arrest team at the briefing.

100. All Plaintiff had told Barravecchio was that all the stress of

the pending bust was giving him a headache.

101. Barraveccio lied that Plaintiff had told him that the stress of the bust was aggravating a pre-existing neck-injury from a racing accident.

102. Barracchio only heard about a pre-existing condition at the hospital when Plaintiff told the doctor so, which was not from racing.

103. Plaintiff never said he had a previous injury from a racing accident, as he has never had such.

103b. Barravecchio stated that medical exam showed no new damage, only pre-existing condition.

104. Medical examination ordered by the judge showed otherwise.

105. Barravecchio lied that the hospital gave Plaintiff aspirin and told him to have a nice day.

106. The ER took x-rays and did a CT and MRI, noted head, face and neck and left elbow injury, multiple contusions, prescribed a Non-Steroidal Anti-Inflammatory Drug and recommended follow-up care upon Plaintiff's return to Arizona.

107. Jimenez said that he had arranged for Plaintiff to come to Pittsburgh to do a "reverse operation" where Plaintiff and an undercover would buy marijuana for $25,000.

108. The operation was to **sell** marijuana for $25,000.

109. Jimenez lied that the second target arrived unexpectedly at the scene.

110. Jimenez knew at least 1½ hours before his arrival as Jimenez was present when Plaintiff took the target's call asking if it was OK to bring a friend along.

111. Jimenez also knew because they had the targets under surveil-

lance all along and followed them to the Home Depot.

112. Surveillance had also radioed ahead that they were getting close for everyone to get into position.

113. Jimenez lied that the last thing he transmitted was that "the target was outside next to the undercover."

114. The target at no point stood next to the undercover.

115. The only person that ever stood next to the undercover was Plaintiff, who had been standing there all along.

116. The target had already returned to his vehicle when Barravecchio gave the signal to close in.

117. Jimenez is lying to cover for Banovsky's unlawful actions.

118. Jimenez lied that while the arrest teams approached, the target went back into his vehicle leaving only Plaintiff standing next to the undercover, Barravecchio.

119. Barravecchio only gave the signal for the arrest team to approach after the target had returned to his vehicle.

120. Jiminez lied that the arrest team only saw a photograph of Plaintiff and that they did not know what he was wearing.

121. While suiting up, Barravecchio and Jimenex discussed that they should have everyone present come and ID Plaintiff and see what he was wearing.

122. Jimenez shouted the order out and everyone came to ID Plaintiff in the undercover vehicle where he was sitting.

123. Jimenez lied that he did not speak to Plaintiff after the incident until he called the next day complaining of pain.

124. Jimemez tried to tell Plaintiff right after the incident that the assault was because of his last transmission while they argued.

125. The transmitter on Plaintiff was still on and would have recorded Jimenez arguing with Plaintiff.

126. Jiminez lied that he had had a conversation with Banovsky after the incident about it being a good idea to show the arrest team the informant prior to the arrest.

127. Drews lied to cover for Banovsky's unlawful assault on Plaintiff.

128. Drews lied that he did not see Plaintiff at the briefing but only a white and black photograph.

129. Drews was there with Plaintiff for at least two hours before the bust and witnessed Plaintiff getting ID'ed by everyone.

130. If as group supervisor all he did was show the team a black and white photograph, he was derelict and negligent not ensuring Plaintiff was properly identified, but he is lying.

131. Drews said that no one in the arrest team was specifically assigned to arrest anyone in particular.

132. While all others had their guns drawn, the officer arresting the undercover and Banovsky "arresting" Plaintiff did not have their guns drawn.

133. Drews said Banovsky was assigned to go in and take everyone into custody and make the scene safe.

134. Banovsky was the first one on the scene, ran right past the two targets in their vehicle and headed straight for Plaintiff who had been shoved in behind him by Barravecchio.

135. It is inconceivable that only one person would be charged with the responsiblility to rush in by himself, arrest everyone and make

the scene safe.

136. Drews lied that he had explained to Plaintiff that they were making the scene safe and that Banovsky did not mean to hurt Plaintiff.

137. Drews in fact apologized for Plaintiff getting hurt saying it was their fault.

138. Drews lied that he had told Plaintiff that he should have gone along with the program as he was told to do.

139. Drews lied that he asked Plaintiff if he wanted medical treatment.

140. A State Trooper in whose car Plaintiff was sitting spitting blood and dirt asked if Plaintiff wanted an ambulance, not Drews.

141. Drews lied that Plaintiff had told him that he had a crushed vertebrae from a previous accident.

142. Plaintiff did not get a chance to speak to Drews until him and Barravecchio were driving Plaintiff back to the motel.

143. Drews said that Plaintiff was deactivated by Arizona authorities for unsatisfactory work since the incident.

144. Plaintiff in fact had received high recommendations from the FBI in Arizona.

145. The DEA had Plaintiff return to Pittsburgh again for another operation nine months later.

146. On or before the date of the internal affairs investigation, all individual defendants conspired to tell consistant lies to cover for Banovsky's brutal assault and to deprive Plaintiff of redress, in violation of 42 U.S.C. § 1983.

## CLAIMS

(i) Banovsky under color of State law violated Plaintiff's right secured by the Constitution and the laws to be free from assault.

(ii) Banovsky sadistically and maliciously assaulted Plaintiff.

(iii) Banovsky lied to internal affairs investigator to intentionally cause Plaintiff emotional distress.

(iv) Drews negligently failed to supervise the actions of Banovsky that cause Plaintiff's injuries.

(v) Drews lied to internal investigations to intentionally inflict and cause Plaintiff emotional distress.

(vi) Jimenex negligently faied to supervise the actions of Banovsky that caused Plaintiff's injuries.

(vii) Jimenez lied to internal affairs investigation to intentionally inflict and cause Plaintiff emotional distress.

(viii) Barravecchio lied to internal affairs investigation to intentionally inflict and cause Plaintiff emotional stress.

(ix) JOHN DOE failed to supervise its employees, or failed to ensure agents acting on its behalf were properly supervised, which cause Plaintiff's injuries and emotional distress.

(x). All individual defendants conspired against Plaintiff.

## DAMAGE

a) Plaintiff suffered being violently shaken, blunt force trauma to head, arm, neck and back, closed head injury, concusion, blurred vision, injury to cervical spine, aggravating previous injury, back pain, headcahes, neck pain, inconvenience, mental anguish, loss of enjoyment of life's pleasures, money for medical attention, physical therapy, medical supplies, loss of earning capacity,

impairment of general health, strength and vitality,, and emotional distress.

## DAMAGES

Plaintiff prays for the following recovery for damages:

I.   From Defendant Banovski - $1.5 million.

II.  From Defendant Drews - $750,000.

III. From Defendant Jimenez - $500,000.

IV.  From Defendant Barravecchio - $250,000.

V.   From JOHN DOE - $7.5 Million.

   offset by damages recovered from all other Defendants.

VI.  Punitive damages from all defendants liable.

VII. Other equitable remedies the jury or the court decides appropriate in addition.

<u>Jury trial demanded on all issues so triable</u>.

Under penalty of perjury I declare the foregoing to be true and correct, to the best of my knowledge and belief.

September 1, 2010

David Nekula  #14098-196
Plaintiff pro se
Federal Correctional Institution
P.O. Box 9000
Safford, Arizona
85548